CHANDLER, Justice,
concurring in part and dissenting in part:
¶ 18. I write separately to express my concerns about Williams’s ability to knowingly, intelligently, and voluntarily waive his Miranda[3] rights. A waiver is an intentional relinquishment of a known right or privilege. Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) (emphasis added). We must “‘indulge every reasonable presumption against waiver’ of fundamental constitutional rights and ... we ‘do not presume acquiescence in the loss of fundamental rights.’ ” Id. (citations omitted). The prosecution bears the heavy burden of proving beyond a reasonable doubt that a waiver was knowing, voluntary, and intelligent. Jordan v. State, 995 So.2d 94, 106 (Miss.2008).
¶ 19. For a waiver to be knowing and intelligent, it must be “made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.” Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986). According to the tests administered by Gilbert S. Mac-vaugh, Williams had an IQ of 53, which is three standard deviations below the mean. He had a verbal IQ score of 55, in the “extremely low” range. Dr. Macvaugh reported that Williams’s verbal IQ score places him in the lowest one tenth of one percent of the population.
¶20. According to the Diagnostic and Statistical Manual of Mental Disorders, a person with an IQ score of 50-55 is within the score range of moderate mental retardation or mild mental retardation. Dr. Macvaugh noted that Williams had scored in the “upper moderate to lower mild range of mental retardation.” According to the DSM-IV,
*780 Moderate mental retardation is roughly equivalent to what used to be referred to as the educational category of ‘trainable.’ ... Most of the individuals with this level of mental retardation acquire communication skills during early childhood years. They profit from vocational training and, with moderate supervision, can attend to their personal care. They can also benefit from training in social and occupational skills but are unlikely to progress beyond the second-grade level in academic subjects. ...
American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.1994) (emphasis added). An adult moderately mentally retarded person has “a mental age of 6 to 8 years.” John W. Jacobson and James A. Mulick, Manual of Diagnosis and Professional Practice in Mental Retardation 18 (1996). These individuals “generally have functional language, although their intelligibility may be poor, but reading and money, or numbers, skills are typically not functional, and some supervision of self-care may be necessary.” Id. For these individuals, “adult independence typically is not achieved;” usually, they must reside with relatives or in an out-of-home care setting. Id.
¶ 21. This is consistent with Dr. Mac-vaugh’s findings regarding Williams. His sentence-comprehension was at the third-grade level. His “general fund of knowledge appeared impoverished.” Williams could not spell the word “world.” He did not know the meaning of common sayings like “one cannot judge a book by its cover” and “there is no use crying over spilled milk.” His only job lasted for two months, he has never lived independently, and he has received a disability check since he was four or five years old. His mother manages his finances and does his grocery shopping. His mother reported that he “is a pleaser of authority ... easy to be influenced, he will agree with you if you don’t get mad at him.” Dr. Macvaugh had difficulty teaching Williams abstract concepts, such as the plea-bargaining process. In fact, Williams was found competent to stand trial only after two months of training, after which the psychologist concluded that “complex legal concepts will need to be explained to him in simple language.”
¶22. Regarding the characteristics of mentally challenged individuals in the criminal justice system, it has been said that
Many mentally retarded people have limited communication skills. The most seriously disabled persons have no expressive language and limited or no receptive language. Therefore, it would not be unusual for a mentally retarded individual to be unresponsive to a police officer or other authority or to be able to provide only garbled or confused responses when questioned. Even when the mentally retarded person’s language and communication abilities appear to be normal, the questioner should give extra attention to determining whether the answers are reliable. Several factors can influence the reliability of an answer. For example, many people with mental retardation are predisposed to “biased responding” or answering in the affirmative questions regarding behaviors they believe are desirable, and answering in the negative questions concerning behaviors they believe are prohibited. The form of a question can also directly affect the likelihood of receiving a biased response, and thus police officers, judges, and lawyers may inadvertently or intentionally cause the susceptible mentally retarded accused person to answer in an inaccurate manner by asking a question in an inappropriate form.
*781 James W. Ellis and Ruth A. Luckasson, Mentally Retarded Criminal Defendants, 53 Geo. Wash. L.Rev. 414, 428 (1985).
¶ 23. When Officer Joel administered the Miranda warnings, he made no effort to explain the warnings to Williams. Although Joel testified that Williams appeared to understand the warnings and responded affirmatively to Joel’s questions, those facts do not necessarily signify that Williams waived his rights “with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it” as required to satisfy the Fifth Amendment. There is a serious danger that Williams responded affirmatively in order to please Joel without any meaningful conception of the rights he waived in doing so. For these reasons, I believe the State fell woefully short of proving that Williams knowingly and intelligently waived his rights.
¶24. Requiring that the trial judge hold another suppression hearing on remand will do nothing to cure the lack of proof supporting the admission of Williams’s statement. While I concur -with the majority’s finding that the trial court applied the incorrect legal standard, I dissent to their ordering another suppression hearing. I would reverse the trial court’s decision admitting Williams’s statement and remand for a new trial in which the statement is. not placed into evidence.
KITCHENS AND KING, JJ„ JOIN THIS OPINION.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).